# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| MICHAEL STOKEY, | CASE NO. 5:18-CV-1011 |
| PLAINTIFF, | JUDGE SARA LIOI |
| vs. | MEMORANDUM OPINION AND ORDER |
| NORTH CANTON SCHOOL DISTRICT, et al., | |
| DEFENDANTS. | |

By this civil rights action, plaintiff Michael Stokey ("Stokey") challenges the dismissal of his son, M.S., from the high school pole vaulting team. On May 4, 2018, the magistrate judge issued a report and recommendation (Doc. No. 13 ["R&R"]) recommending that the Court grant in part and deny in part Stokey's motion for a temporary restraining order seeking M.S.'s immediate reinstatement to the pole vaulting team. Defendants, Superintendent Jeffrey Wendorf ("Superintendent Wendorf") and North Canton City School District ("NCCSD") (collectively "School District"), filed objections to the R&R (Doc. No. 15 ["Obj."]), and Stokey filed a response.[1] (Doc. No. 17 ["Res."]; *see* Doc. No. 16 ["Res. Exhibits"].) The parties agreed that the matter could be submitted on the briefs without a hearing. For the reasons that follow, the objections to the R&R are sustained and the motion for a temporary restraining order is denied.

---

[1] On May 9, 2018, Stokey filed an emergency motion to accelerate the deadlines for filing and briefing objections to the magistrate judge's R&R to facilitate an expedited ruling from the Court before the final track meet of the year on May 16, 2018. (Doc. No. 14.) In a telephonic conference with the Court, counsel agreed to an expedited schedule for briefing. (*See* Minutes, dated 5-9-18.)

## I. BACKGROUND

According to the complaint, M.S. is a freshman at Hoover High School and a member of the high school track and field team. (Doc. No. 1 ["Compl."] ¶ 1.) The head coach of the track team is Nick Stroemple ("Coach Stroemple"). (*See id.* ¶ 8; Doc. No. 15-11 (Affidavit of Nick Stroemple ["Stroemple Aff."]) ¶ 3.) Prior to April 19, 2018, M.S. was also a member of the pole vaulting squad, which is under the direction of an assistant coach, Peter Nupp ("Coach Nupp"). (*See id.* ¶ 6; Doc. No. 1-6 (4-19-18 Superintendent Wendorf letter); Stroemple Aff. ¶ 6; Doc. No. 15-6 (Affidavit of Peter J. Nupp ["Nupp Aff."]) ¶¶ 5-6.)

During the 2018 track season, Coach Nupp twice instructed M.S. to practice pole vault jumps in the rain. It is Stokey's contention that, on each occasion, M.S. slipped off the pole and injured himself. (Compl. ¶ 6.) Subsequently, on April 3, 2018, Coach Nupp again asked M.S. to vault in the rain. "Per [Stokey's] instructions, [M.S.] declined and was suspended from pole vaulting at the April [5th], 2018 track meet." (Doc. No. 1-1 (Affidavit Michael Stokey ["Stokey Aff."]) ¶ 6; Compl. ¶ 7.)

On April 4, 2018, Kristy Stokey, M.S.'s mother, sent an email to Coach Stroemple inquiring as to why M.S. had been suspended from the pole vault team for the April 5, 2018 track meet. (Compl. ¶ 8; *see* Doc. No. 1-2 (4-4-18 K. Stokey email) at 10[2].) In an email response, also dated April 4, 2018, Coach Stroemple explained that he deferred to Coach Nupp on matters relating to when and how the pole vaulters practice and added that Coach Nupp is always mindful of weather. He assured Ms. Stokey that Coach Nupp "will not allow jumpers to go up

---
[2] All page references are to the page identification number generated by the Court's electronic docketing system.

when he feels it is unsafe." (Doc. No. 1-2 (4-8-18 Coach Stroemple email) at 11.) Nonetheless, he also stressed that, pursuant to team policy, if M.S. did not participate in the pole vaulting practices with Coach Nupp, he would "not be permitted to enter a pole vault event for Hoover[,]" but that "he still [would have] the opportunity to compete in other events if he [was] at practice." (*Id*.; Compl. ¶ 8.) Coach Stroemple stressed that these rules applied to all athletes who, like M.S., also receive private coaching for their events. (4-8-18 Coach Stroemple email at 11.)

On April 5, 2018, Stokey emailed the high school athletic director, members of the school board, and Superintendent Wendorf, and proposed to change District policy to prohibit pole vaulting in the rain, and to allow student-athletes to refrain from unsafe activities without punishment." (Compl. ¶ 9; Doc. No. 1-3 (4-5-18 Stokey email) at 14.) A school board member responded, instructing Stokey to follow the proper communication chain by speaking directly with the coach, then the athletic director, the principal, and finally with the superintendent. (Doc. No. 1-3 (board email response) at 14; Compl. ¶ 9.) Stokey claims that he followed this communication chain but was unable to convince the administration to adopt his proposals. (Compl. ¶ 10.)

M.S. did compete as a pole vaulter in a high school track meet on April 10, 2018. (Nupp Aff. ¶ 9.) The School District maintains, and Stokey does not dispute, that during that meet Coach Nupp recommended that M.S. use a different pole to maximize his performance. Coach Nupp claims that M.S. disregarded the recommendation and ultimately failed at his attempts to clear the height. (Nupp Aff. ¶ 10.) During the same meet, the School District contends that, during a discussion with the coaching staff, M.S. and Stokey questioned Coach Nupp's knowledge of pole vaulting rules. (Nupp. Aff. ¶ 9.) The other coaches confirmed that Coach

3

Nupp had the correct interpretation of the pole vault rules. (Stroemple Aff. ¶ 7.) After Coach Nupp left the discussion, M.S. stated that he did not believe that Coach Nupp knew what he was doing, negatively comparing Coach Nupp's coaching methods to that of M.S.'s private coach. (Stroemple Aff. ¶ 10.) Coach Stroemple warned M.S. that if he was unable to find a way to follow Coach Nupp's instructions, he would not be able to pole vault for the high school team. (Stroemple Aff. ¶ 12.)

On April 11, 2018, Coaches Stroemple and Nupp met with M.S. to discuss the April 10, 2018 meet. (Nupp. Aff. ¶ 11.) It is the School District's position that M.S. advised that he would not follow Coach Nupp's instruction because it conflicted with the instruction he received at his private club. (Nupp. Aff. ¶ 11.) A second meeting was scheduled with members of school administration and Stokey for April 12, 2018. In anticipation of that meeting, Coach Nupp sent an email to Coach Stroemple outlining his concerns with M.S. and his parents. In that email, he offered his recommendation that M.S. be removed from the pole vaulting team because M.S. did not trust that Coach Nupp could provide a safe environment in which to compete. (Nupp. Aff. ¶ 13; Doc. No. 15-9 (4-12-18 Nupp email) at 113.)

The April 12, 2018 meeting was attended by Stokey, Superintendent Wendorf, Athletic Director Walker, the principal of the high school, and Coaches Stroemple and Nupp. (Doc. No. 15-1 (Affidavit of Jeffrey Wendorf ["Wendorf Aff."]) ¶ 8.) During the meeting, Stokey stated that M.S. would not vault in the rain. (Wendorf Aff. ¶ 8.) Superintendent Wendorf advised Stokey that if M.S. did not practice he would not be permitted to compete and that the administration trusted the judgment of its coaches. (Wendorf Aff. ¶ 8.)

On April 18, 2018, Stokey attended a school board meeting where he again advocated for

his proposed changes to the coaching policy, but his proposals were rejected. The following day (April 19, 2018), Stokey sent an email to the superintendent and the school board members indicating that he disagreed with their position but that he was appreciative of the opportunity to speak with them. (*Id*. ¶ 11, citing Doc. No. 1-5 (4-19-18 Stokey email).)

Also on April 19, 2018, Coach Nupp sent a letter, dated April 18, 2018, to Athletic Director Walker outlining his concerns regarding M.S.'s continued participation in the pole vaulting program. In addition to M.S.'s refusal to vault in the rain, Coach Nupp cited his concern that M.S. and his parents intended for M.S. to only practice at M.S.'s private pole vaulting club but have the opportunity to compete with the high school squad.[3] Coach Nupp indicated that he believed that this would be a dangerous practice because it would not allow him to properly coach M.S. Coach Nupp also expressed his concern that it would send the wrong message to the other athletes that M.S. was receiving preferential treatment. (Nupp Aff. ¶ 15; 4-18-18 Nupp Letter at 114.) Additionally, Coach Nupp cited M.S.'s unwillingness to accept his instruction unless it was either consistent with the instruction M.S. was receiving at his private club or M.S. independently determined that Coach Nupp's instruction would work. (*Id*.) Coach Nupp indicated that "[t]his would appear to render my coaching useless. Although [M.S.] has shown signs of being coachable in other events he has not shown the same consideration or respect for

---

[3] In an affidavit attached to his response, Stokey avers that he never intended, or expressed to the coaching staff, that he wanted M.S. to practice solely with his private club. (Stokey Aff. 1 ¶ 5.) Instead, he explains that M.S. merely inquired as to whether training exclusively with the private club was an option because he was aware that another student, before Coach Nupp joined the School District, trained exclusively with a private club. (*Id*. ¶¶ 2-4.) He further avers that M.S. never missed a track and field practice during the regular season, and never missed a meet to train with his private club. (*Id*. ¶¶ 1-2.) Stokey does not deny, however, that during the season (and before Stokey spoke before the school board) M.S. questioned Coach Nupp's coaching knowledge and coaching methods, nor does he deny that M.S. advised the coaches that he would not follow Coach Nupp's instructions if they conflicted with the instruction he received from his private coach. Rather, Stokey's affidavit merely states that prior to the season, he instructed his son to follow the high school coaches' instruction. (*See Id*. ¶ 6.) Of course, he acknowledges in his verified complaint that he *did* instruct his son to disregard Coach Nupp's instructions. (Compl. ¶ 7; Stokey Aff. ¶ 6.)

5

my coaching. Therefore, I do not believe that I can coach him." (*Id*.)

Stokey received a letter, dated April 19, 2018, from Superintendent Wendorf advising Stokey that M.S. would no longer be permitted to participate on the pole vaulting team. Specifically, the letter stated

> After many written correspondences and face-to-face meetings, you have been very clear on the points you have made, including your continued concern regarding North Canton City School District's pole vault program and your lack of confidence and trust in our pole vault and track coaches. We have thoroughly investigated your allegations and find them to be unsubstantiated. We trust and support our coaches' judgment regarding practices and safety conditions, and we fully support our coaches as the only people who will determine athlete participation in competitions.
>
> Due to your concerns and lack of trust in our coaches, your son, [M.S.], is restricted from participating in North Canton City School District's pole vaulting program or using any district pole vault equipment or facilities from this point forward.

(Compl. ¶ 12; Doc. No. 1-6 (4-19-18 Superintendent Wendorf letter) at 31.) It is undisputed that M.S. is still a member of the track team and remains eligible to compete in non-pole vaulting events. (*See* Wendorf Aff. ¶ 16; Doc. No. 15-2 (Affidavit of Tim Walker ["Walker Aff."]) ¶ 8.)

On May 2, 2018, Stokey filed the present action in federal court, raising a single claim of First Amendment retaliation against the School District. Stokey claims that he was exercising his constitutional right of free speech by communicating with school officials and administration "regarding his proposed policy changes." (Compl. ¶ 18.) He further avers that, in "retaliation for Stokey's effort [to] change policy, his son was barred from pole vaulting." (*Id*. ¶ 19.)

The present motion for a temporary restraining order, filed contemporaneously with the complaint, was referred to the magistrate judge, who recommended that M.S. be reinstated to the pole vaulting team but that he not be allowed to compete in any track meets unless he practiced

with the team. (R&R at 80.) Pointing to one phrase in the superintendent's letter, and relying, in part, on *Jenkins v. Rock Hill Local Sch. Dist*., 513 F.3d 580, 585-86 (6th Cir. 2008), the magistrate judge found that Stokey was likely to prevail on the merits of his First Amendment retaliation claim because Superintendent Wendorf's letter demonstrates that M.S. was removed from the pole vaulting team because of Stokey's protected speech. She concludes that such action by the School District would have a chilling effect on the First Amendment rights of parents. (R&R at 77, citations omitted.) Nonetheless (and somewhat contradictorily), acknowledging that coaches have the discretion to determine the terms under which student-athletes may compete in events, the magistrate judge denied the motion for a temporary restraining order to the extent it sought to permit M.S. to compete "despite his failure or refusal to obey the directions of his coach." (*Id*. at 80, citing *Lowery v. Euverard*, 497 F.3d 584, 589 (6th Cir. 2007).)

## II. STANDARDS OF REVIEW

### A. Review of a Magistrate's R&R

Under 28 U.S.C. § 636(b)(1), "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Powell v. United States*, 37 F.3d 1499 (table decision), 1994 WL 532926, at *1 (6th Cir. Sept. 30, 1994) ("Any report and recommendation by a magistrate judge that is dispositive of a claim or defense of a party shall be subject to de novo review by the district court in light of specific objections filed by any party.") (citations omitted); *Orr v. Kelly*, No. 1:14–cv–2302, 2015 WL 5316216, at *2 (N.D. Ohio Sept. 11, 2015) (citing *Powell*, *inter alia*, 1994 WL 532926, at *1); Fed. R. Civ. P. 72(b)(3). After review, the district judge "may accept, reject, or

modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3). "An 'objection' that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context." *Aldrich v. Bock*, 327 F. Supp. 2d 743, 747 (E.D. Mich. 2004).

B. **Motion for a Temporary Restraining Order**

Plaintiff bears the burden of establishing entitlement to a preliminary injunction. *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009) (citing cases). Preliminary injunctive relief is "an extraordinary remedy which should be granted only if the movant carries [his] burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban Cty.*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)). "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion[.]" *Leary*, 228 F.3d at 739 (citations omitted). Ultimately, the decision to grant or deny preliminary injunctive relief rests within the discretion of the Court. *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998) (citation omitted).

Consideration of whether to grant a preliminary injunction is governed by four factors. First, the Court must determine "whether the plaintiff has established a substantial likelihood or probability of success on the merits" of his claim. *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010) (quotation marks and citation omitted). Second, the Court will determine "whether the [plaintiff] would suffer irreparable injury" if a preliminary injunction did not issue. *NACCO Materials Handling Grp. v. Toyota Materials Handling USA, Inc.*, 246 F. App'x 929,

935 (6th Cir. 2007) (citation omitted). Third, the Court must determine "whether the issuance of a preliminary injunction would cause substantial harm to others[.]" *Leary*, 228 F.3d at 739 (quotation marks and citations omitted). Finally, the Court must consider "whether the public interest would be served" if the Court were to grant the requested injunction. *Overstreet*, 305 F.3d at 573 (citations omitted). The four factors are not prerequisites, but are interrelated considerations that must be balanced against each other. *Leary*, 228 F.3d at 736 (citations omitted). The first factor—the likelihood of success—is, however, the predominant concern. "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)).

The standard for granting a temporary restraining order under Rule 65 is "logically the same as for a preliminary injunction with emphasis, however, on irreparable harm[.]" *Reid v. Hood*, No. 1:10 CV 2842, 2011 WL 251437, at *2 (N.D. Ohio Jan. 26, 2011) (citing *Motor Vehicle Bd. of Cal. v. Fox*, 434 U.S. 1345, 1347 n. 2, 98 S. Ct. 359, 54 L. Ed. 2d 439 (1977)). "[T]he purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996). "If the balance of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined, then there is cause to preserve the status quo." *Reid*, 2011 WL 251437, at *2 (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981)).

III. DISCUSSION

The School District argues that the magistrate judge erred in applying Sixth Circuit law to

the first prong of the preliminary injunctive relief standard—the likelihood of success on the merits—because both the undisputed facts and the law dictate that the School District's decision was neither motivated, nor constrained, by Stokey's exercise of his First Amendment right to free speech. Citing *Lowery*, the School District argues that the Court must find that, notwithstanding Stokey's right to voice his opinion, the School District retained the discretion to dismiss M.S. from the pole vaulting team for failing to abide by the coaches' rules. (Obj. at. 85-89.) The Court agrees with the School District and sustains the objection.

It is well settled that students do not "'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Lowery*, 497 F.3d at 588 (quoting *Tinker v. Des Moines Indep. Cty. Sch. Dist.*, 393 U.S. 503, 507, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969)). Likewise, parents have the right to express their opinions and advocate for the rights of their children. These rights, however, are not absolute. "[S]chool officials may regulate speech that materially and substantially interferes 'with the requirements of appropriate discipline in the operation of the school.'" *Id*. (quoting *Tinker*, 393 U.S. at 513).

Applying *Tinker* to speech related to matters affecting school operation and discipline, the Court "must consider the content and the context of the speech, and the nature of the school's response." *Id.* at 588; *see Corlett v. Oakland Univ. Bd. of Trs.*, 958 F. Supp. 2d 795, 803 (S.D. Ohio 2013) ("the leeway granted educators to curtail speech within the school gates depends on the content of the student's speech and the context surrounding its making"). Because students "do not have a general constitutional right to participate in extracurricular athletics[,] student speech occurring in the context of a school-sponsored athletic program is subject to more restrictions than that occurring in the classroom. *Lowery*, 497 F.3d at 588-89 (noting that while

in the classroom it is "appropriate for students to learn to express and evaluate competing viewpoints[,] it can be detrimental to an athletic team that depends on the coach to develop and execute a strategy to win) (citing, *inter alia*, *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995)).

The speech in question occurred in the context of a high school track program, and Stokey's motion, therefore, is governed by *Tinker* and the Sixth Circuit's decision in *Lowery*. In *Lowery*, high school football players who disagreed with the head coach's management of the team circulated a petition stating that they hated the head coach and did not want to play for him. When the coaching staff learned of the petition, they interviewed the student-athletes. Those athletes who signed the petition but apologized to the head coach were permitted to play, but the plaintiffs and others who did not were dismissed from the team. *Lowery*, 497 F.3d at 586. The district court denied defendants' motion for summary judgment.

On appeal, the court found that the case was not "primarily about Plaintiffs' right to express their opinions, but rather their alleged right to belong to the [high school] football team on their own terms[,]" namely to play football after signing a petition stating that they hated the coach. *Id*. at 589. The court found that by signing the petition, the players attacked the coach's authority. Noting that "[t]he success of an athletic team in large part depends on its coach[,] the court stressed that an attack on his authority "necessarily undermines his ability to lead the team." *Id*. at 594. In reaching this conclusion, the court acknowledged that the players had a right to express their opinions about the coach, free of retribution or denial of the constitutional right to a public education. This did not mean, however, that the coaching staff was required to tolerate disrespect and insubordination. The court explained that

> High school football coaches, as well as government employers, have a need to maintain order and discipline. Requiring coaches to tolerate attacks on their authority would effectively strip them of their ability to lead. It would also do a great disservice to other players who wish to play on a team free from strife and disunity; a team cannot function as a unit with groups of players and the coaches pulling in opposite directions.

*Id*. at 599.

Recognizing that "the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs[,]" the Sixth Circuit analogized that the First Amendment does not "require high school football teams to be run in that fashion. When players voluntarily 'go out' for a team they implicitly agree to accept the coach's authority. When the government manages a voluntary program it may restrict conduct, including speech, that threatens the purpose of the program." *Id.* at 600 (citing *Connick v. Myers*, 461 U.S. 138, 149, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)). Because it was reasonable for the defendants "to forecast that [the] petition would undermine [the coach's] authority and sow disunity on the football team[,]" the court found that "there was no constitutional violation in Plaintiffs' dismissal from the team. *Tinker* does not require teachers to surrender control of the classroom to students, and it does not require coaches to surrender control of the team to players." *Id*. at 600-01 (citing *Tinker, supra*).

The Court finds that the framework set forth in *Lowery* guides the analysis as to whether Stokey is likely to prevail on the merits on his First Amendment retaliation claim. While this action is in the early stages and the record is not yet fully developed, the Court agrees with the School District that this case appears to be less about Stokey's free speech rights and more about his son's alleged right to participate on the high school pole vaulting team on his own—or his

12

father's—terms. *See Lowery*, 497 F.3d at 589, 600 ("Confusing the right to express one's opinion with the right to participate in a voluntary government program on one's own terms would lead to an unworkable legal regime.") To be sure, Stokey has the right to speak out against any practices or policies that he views as dangerous (and to restrict his son from participating in activities he perceives as dangerous), but the coaching staff also has the right to set polices and rules for competition and to discipline those who refuse to follow the rules.

It is undisputed that M.S., per his father's instructions, refused to abide by the coaches' rules regarding practice. Of course, it is reasonable to conclude that a player's refusal to follow such rules would lead to disunity on the team and resentment from the players who agreed to be subjected to the rules, and it is unlikely that dismissing an athlete who refused to practice on account of his own personal assessment that the conditions were unsafe would run afoul of the First Amendment. *See Lowery*, 497 F.3d at 591-92 (recognizing that "*Tinker* does not require school officials to wait until the horse has left the barn before closing the door. Nor does *Tinker* require certainty that disruption will occur") (quotation marks and citation omitted); *see Doninger v. Niehoff*, 527 F.3d 41, 51 (2d Cir. 2008) (characterizing as "misguided" the notion "that *Tinker* requires a showing of actual disruption to justify a restraint on student speech"); *see, e.g., Green v. Sandy*, No. 5:10-cv-367-JMH, 2011 WL 4688639, at *6 (E.D. Ky. Oct. 3, 2011) ("*Lowery* . . . recognized that a student-athlete's expression of dissatisfaction with her team or coach causes great harm to team unity and therefore constitutes a disruption and disturbance which school officials have a right to prevent.") (citing *Lowery*, 497 F.3d at 593, 596).

Yet, Stokey does not accept that M.S. was dismissed from the pole vaulting team because M.S. refused to abide by the school policy of vaulting in the rain. Rather, he alleges, in

13

conclusory fashion, that M.S. was dismissed from the team in "retaliation for Stokey's effort [to] change [that] policy[.]" (Compl. ¶ 19.) However, the Court, finds it unlikely that Stokey will be able to establish the causal connection between his alleged protected activity and the decision to dismiss M.S. from the pole vaulting team. *See Jenkins*, 513 F.3d at 586 (6th Cir. 2008) (citing, as an element of First Amendment retaliation, that the adverse action taken by the government was motivated, at least in part, by the plaintiff's exercise of his constitutional rights) (citation omitted); *see, e.g., McCook v. Spriner Sch. Dist.*, 44 F. App'x 896, 905-09 (10th Cir. 2002) (superintendent's adverse actions, including immediately expelling student and excluding parents from school property, were not substantially motivated by parents' speech criticizing the superintendent, as required for First Amendment retaliation claim); *Blasi v. Pen Argyl Area Sch. Dist.*, 512 F. App'x 173 (3d Cir. 2013) (affirming district court's denial of preliminary injunction for father who claimed First Amendment retaliation in connection with sons' participation in middle school basketball program because father was unlikely to prevail on his constitutional claim).

Stokey concedes that on April 3, 2018, before he ever advocated for a change in the pre-existing policy of requiring athletes to vault in the rain, he instructed M.S. not to vault in the rain and M.S. was suspended from pole vaulting at the next track meet. (Stokey Aff. ¶ 6; Compl. ¶ 7; *see* Compl. ¶¶ 8-10.) He does not dispute that the coaching staff had an established policy of requiring vaulting in the rain, nor does he dispute that he instructed his son to disregard that policy and M.S. was subsequently suspended. Further, the complaint does not allege that the policy was applied selectively against M.S., or that other students who refused to practice— including students whose parents had not engaged in free speech—were permitted to compete.

While the Court cannot anticipate how the record will develop following discovery, there does not appear to be a substantial likelihood that Stokey will be able to demonstrate that the School District retaliated against him, or his son, because Stokey advocated for a change in the pole vaulting policy. Stokey cannot direct his son to violate the policy and then claim First Amendment retaliation when he complains about that action. If this were the case, then every insubordinate action by a student could be shielded by a parent's subsequent complaints about the policy that formed the basis for the discipline for the insubordinate act.

Stokey points to the fact that the magistrate judge found the language of Superintendent Wendorf's letter suggestive of retaliation. With respect, the Court disagrees with the magistrate judge's interpretation of the letter. While the superintendent stated, in part, that M.S. was being dismissed from the pole vault team "[d]ue to [Stokey's] concerns," he did not indicate that the dismissal was due to the fact that Stokey publically expressed those concerns. After all, it was Stokey's concern regarding the purported dangers of vaulting in the rain that caused Stokey to forbid his son from complying with the coaches' policy regarding practice which, in turn, resulted in M.S.'s suspension from competing in the next track meet. The record further demonstrates these same concerns were shared by M.S., who advised the coaching staff that he would not vault in the rain and that he would not follow any coaching instruction that contradicted the instructions he received at his private club. The rest of Wendorf's letter, read in context, and with regard to all that had transpired, suggests that it was Stokey's insistence on substituting his own judgment for that of the coaches that served as the impetus for his son's dismissal from the team. (*See, e.g.,* 4-19-18 Wendorf Letter at 31 [stressing that the School District "trust[s] and support[s] our coaches' judgment regarding practices and safety conditions,

and we fully support our coaches as *the only people who will determine athlete participation in competitions*") (emphasis added).

Of course, even if Superintendent Wendorf's letter could be read as some evidence that the adverse action was motivated in part by Stokey's protected activity, Stokey would not prevail on his claim if the School District could demonstrate that the same adverse action would have been taken in the absence of the protected activity. *See Jenkins*, 513 F.3d at 586 ("if the defendant can show he would have taken the same action in the absence of the protected activity, he is entitled to summary judgment") (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999) (en banc)). The record, at this point, shows that the coaching staff was contemplating the removal of M.S. from the pole vaulting squad well before Stokey spoke at the April 18, 2018 school board meeting. As set forth above, Coach Stroemple had warned M.S. at the April 10, 2018 track meet that if he could not follow Coach Nupp's instructions, he would be off the squad. (Stroemple Aff. ¶ 12.) Further, as early as April 12, 2018, Coach Nupp had concluded that M.S. could not follow his instruction and should be removed from the team. (4-12-18 Nupp email.) The School District also points to evidence that the superintendent's ultimate decision was not motivated by Stokey's speech.[4] (Wendorf Aff. ¶¶ 17-19.) Though Stokey complains that the coaches had not advised him that M.S. was off the squad, the record is clear that the coaches'

---

[4] Stokey also makes much of the fact that the decision to remove M.S. from the pole vaulting squad was communicated by the superintendent and not by the coaches. (Res. at 146; Doc. No. 17-1 (Affidavit of Michael Stokey I ["Stokey Aff. I"]) ¶ 8.) According to Stokey, this violates the School District's athletic policies that provide that the coach is to determine team policies. (Res. at 146.) The letter does not state that the superintendent made the decision. In his affidavit, Superintendent Wendorf explained that the letter was based on the "recommendation of Coach Nupp who had expressed, as early as April 12, 2018 that M.S." should not be on the squad. (Wendorf Aff. ¶ 17.) More to the point, the question before this federal court is not whether the decision by the School District was correct, advisable, or even fair. Instead, the Court is only concerned with whether Stokey is likely to prove that the decision was made in retaliation for the exercise of his constitutional rights. *See Lowery*, 497 F.3d at 589 (noting that the "issue is not whether the Court approves of [the coach's] methods, or whether it thinks that Plaintiff's dismissal from the team was fair").

concern pre-dated any protected activity.[5]

The Court agrees with the magistrate judge that an adverse retaliatory action taken against a child could have a chilling effect on a parent's exercise of his own constitutional rights. (*See* R&R at 77, citing *Jenkins*, 513 F.3d at 589 and *Cain v. Tigard-Tualatin Sch. Dist. 23J*, 262 F. Supp. 2d 1120, 1130 (D. Ore. 2003)). In *Jenkins*, for example, the court considered two consolidated cases wherein parents claimed that they were retaliated against by school officials after they advocated for certain school services for their children. In reversing the district court's grant of summary judgment to the school defendants with respect to plaintiff Jenkins, the court noted that denying a child educational services and making a false report of child neglect "would chill a person of ordinary firmness from engaging in speech." *Jenkins*, 513 F.3d at 589.[6] The Court does not believe that it is faced with a similar situation here.

The context of the speech in this case distinguishes it from the situation presented in *Jenkins*. While the plaintiffs' speech in *Jenkins* involved participation in educational programs, Stokey's speech occurred in the context of his son's participation in a voluntary athletic program. *See Lowery*, 497 F.3d at 588. The School District has not interfered with M.S.'s education or his access to educational programs, nor would it be permitted to do so in retaliation. M.S.'s "regular education has not been impeded, and significantly, [Stokey] remains free to continue [his]

---

[5] Even if the Court considers Stokey's April 5, 2018 email to various school administrators and board members as protected activity, the fact remains that M.S.'s refusal to abide by Coach Nupp's instruction to vault in the rain predated the email. (*See* Compl. ¶ 9.) From that first act of disobedience on April 3, 2018, the record demonstrates that Stokey and M.S. repeatedly, and consistently, maintained that M.S. would not follow Coach Nupp's instructions to vault in the rain. M.S. was disciplined for his initial refusal to comply with coaching instruction and there is nothing in the record to suggest that the coaching staff would have taken a different approach to future disobedience but-for Stokey's protected speech.

[6] In addition to making a false report to Children Services against plaintiff Jenkins, the school administrator allegedly refused to provide home-school education for Jenkin's daughter by means of a tutor. *Id*.

campaign for" what he views are safer policies regarding pole vaulting. *See id*. at 600 (emphasis omitted). Yet, in the context of this voluntary program, the coaches have a right to determine the rules and requirements for participation, and they further have the right to discipline, or even dismiss from sporting teams, student-athletes who refuse to abide by those rules.[7] Stokey's own factual allegations and supporting documentation would suggest that the School District's decision was nothing more than an exercise of that discretion.[8] *See Wildman ex rel. Wildman v. Marshalltown Sch. Dist*., 249 F.3d 768, 771 (8th Cir. 2001) (School officials have a legitimate interest in affording student-athletes "an educational environment conducive to learning team unity and sportsmanship and free from disruptions that could hurt or stray the cohesiveness of the team.")

With respect to the second prong of the analysis, the magistrate judge observed that, "[h]aving shown that he has a strong likelihood of success on the merits of his First Amendment retaliation claim, Stokey has also meet the irreparable harm prong of the test for injunctive relief. (R&R at 78, citing, *inter alia*, *Elrod v. Burns*, 427 U.S. 347, 374, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976).) However, given that the Court finds that Stokey is not likely to prove a violation of his constitutional rights, case law holding that even a temporary violation constitutes irreparable harm is inapplicable. Moreover, M.S. had already missed several track meets before Stokey filed suit, and Stokey has failed to demonstrate how missing the few remaining events will result in irreparable harm. While Stokey notes in his motion that his son can never "repeat his freshman

---

[7] The School District's written athletic code provide that "[a]thletes must attend all practices and games unless excused by the coach of the team. The coach will determine specific penalties for violations as a part of the team's individual policies." (Wendorf Aff. ¶ 13; Doc. No. 15-7 (Athletic Department Policies and Procedures) at 109.)

[8] In fact, it was within the coaches' discretion to dismiss M.S. from the track team entirely—and not just the pole vaulting squad—for his insubordination. The fact that the coaches chose to permit M.S. to continue to compete in non-pole vaulting events demonstrates that they used restraint in exercising their discretion.

year of sports," he has failed to demonstrate how missing part of one season, even if that part includes the district tournament, would irrevocably damage an athlete's high school career, particularly since M.S. is a freshman and will have three more years of high school eligibility.

The magistrate judge determined that the third prong of the preliminary injunction analysis—harm to third parties—was neutral, finding that neither party "has sufficiently supported its position as to this factor." (R&R at 78.) By its second objection, the School District takes issue with this determination to the extent the magistrate judge rejected the argument that the harm would flow from the fact that other student-athletes who had practiced and followed the coach's instructions could be displaced by M.S. if he were to be reinstated. (Stroemple Aff. ¶ 15 ["If M.S. had not practiced and be[en] allowed to compete, he may have displaced another team [member] who had followed coach's instructions and did, in fact, practice at North Canton. This is due to the fact that in certain competitions, a school may only enter two athletes."].) Of course, even without evidence that M.S. would potentially deprive another student-athlete of the chance to compete, the fact remains that permitting a student-athlete who has disobeyed coaching instructions to compete would likely cause disharmony and resentment on the team. *See Lowery, supra* (permitting attacks upon a coach's authority creates disunity and strife that does a "great disservice" to other players). The School District's second objection is sustained, as the third prong of the injunctive relief analysis weighs against the imposition of immediate injunctive relief.

As set forth above, the Court finds that the first three factors weigh against granting preliminary injunctive relief. Fourth and finally, the Court finds that, in the absence of a substantial likelihood of success on the merits, public interest would not be served by disturbing

a discretionary decision and awarding the extraordinary remedy of federal injunctive relief. Section 1983 "'was not intended to be a vehicle for federal-court corrections of errors in the exercise [of school administrators'] discretion which do not rise to the level of violations of specific constitutional guarantees.'" *Lowery*, 497 F.3d at 589 (quoting *Wood v. Strickland*, 420 U.S. 308, 326, 95 S. Ct. 992, 43 L. Ed. 2d 214 (1975)).

### IV. CONCLUSION

Because none of the relevant factors weighs in favor of a grant of immediate injunctive relief, and for all of the foregoing reasons, the Court SUSTAINS the objections to the R&R and DENIES Stokey's request for a temporary restraining order.

**IT IS SO ORDERED**.

Dated: May 15, 2018

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**